**CONSOLIDATED FOODS CORPORATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 14197.**

United States Court of Appeals
Seventh Circuit.

March 24, 1964.

**624**

Daniel Walker, Anderson A. Owen, Chicago, Ill., Samuel H. Horne, Washington, D. C., William I. Goldberg, Hopkins, Sutter, Owen, Mulroy & Wentz, Chicago, Ill., for petitioner.

J. B. Truly, Asst. Gen. Counsel, Gerald Harwood, Atty., James McI. Henderson, Gen. Counsel, Frederick H. Mayer, Atty., F. T. C., Washington, D. C., for respondent.

Before KNOCH and CASTLE, Circuit Judges, and MERCER, District Judge.

CASTLE, Circuit Judge.

This case is before the Court on the petition of Consolidated Foods Corporation (hereinafter referred to as Consolidated) for review of an order of divestiture issued by the Federal Trade Commission following an administrative hearing upon a complaint charging that Consolidated's acquisition of Gentry, Incorporated, violates Section 7 of the Clayton Act.[1]

Consolidated was incorporated in 1941 as a wholesale grocery house. Subsequently, it expanded by mergers to encompass a wide variety of food industry enterprises. As of December 31, 1958,[2] it operated eight manufacturing divisions or subsidiaries engaged in processing canned soups, pickles, dressing, fruits, bakery goods, frozen foods, beet sugar, dehydrated onion, dehydrated garlic, and capsicum spices in plants located in eleven different states scattered across the country. In addition, it sold food products at wholesale through twelve units in an equal number of states, and at retail through three units, including the Piggly-Wiggly Midwest Co. and Klein Supermarkets, Inc., chains.

Consolidated acquired Gentry, Incorporated, on April 30, 1951. Both before and since that date Gentry has been a manufacturer of dehydrated onion and garlic and of assorted capsicum spices.[3] At the time of acquisition Gentry operated two plants and had assets valued at $1,600,000. Consolidated's assets were then approximately $60,000,000. Consolidated has exhibited a capacity for vigorous growth. By 1956 its assets exceeded $99,000,000 and its annual net sales of all products had risen to $286,252,695.

Dehydrated onion and garlic are sold primarily to food processors, and also to "institutional" users consisting of large restaurants, commissaries, steamship and large food servicing organizations, to

---

1. 15 U.S.C.A. § 18, the pertinent portion of which provides: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

2. The complaint herein issued December 18, 1957.

3. This case involves only Gentry's dehydrated onion and garlic business, which comprises the bulk of its trade.

distributors which resell to food processors and institutional users, to spice grinders and repackagers which package spices for sale through retail stores, and to the government.

At the time of the challenged acquisition the industry consisted of only three domestic producers of both dehydrated onion and garlic. They were Gentry, Basic Vegetable Products, Inc., (Basic) and Puccinelli Packing Company (Puccinelli). One other concern, J. R. Simplot Company (Simplot) produced only dehydrated onion. Since that time Simplot has left the field for reasons having no bearing on the issues here involved. And, Gilroy Foods, Inc., which entered the field in 1959 was acquired in 1961 by McCormick Foods, Inc., whose requirements exceed Gilroy's output. In 1961 California Vegetable Concentrates, Inc., a wholly-owned subsidiary of General Foods Corporation (whose annual sales of a variety of food products exceed one billion dollars) announced plans to build a plant to process dehydrated onions, scheduled for completion late in 1961.

The trend toward ever increasing use of table-ready foods such as dehydrated soups, and the increasing acceptance of dehydrated onion and garlic as a substitute for fresh onion and garlic because of economy and quality control, are among the factors which have contributed to the significant growth in industry sales since 1950. For a period of eleven years Gentry and Basic have accounted for better than 85% of total industry sales. Immediately prior to the Consolidated-Gentry merger, Basic accounted for 60% and Gentry 28% of dehydrated onion sales. By 1958, these figures were 57% and 35%, respectively. In dehydrated garlic sales, Basic had 36% of the market in 1950 and 50% in 1958, while Gentry's shares were 51% and 39% for the same years.

As a wholesaler and retailer of food products, Consolidated buys from many food processors. A substantial number of these processors require dehydrated onion and garlic in packing their products.

There is evidence that in a number of instances Consolidated overtly attempted to use its purchasing power as a device to obtain business for its Gentry division—to make sales of dehydrated onion and garlic to food processors from which Consolidated made purchases in connection with its wholesale and retail operations. But the record also reveals that this was not a matter of across-the-board company policy and that Consolidated recognized that for practical purposes the "I will buy from you if you will buy from me" reciprocity technique, in the setting here involved, had its limitations and that:

> " * * * each situation has to be met individually as we certainly are in a better position to tell a private label supplier that he should use our raw materials, and by the same token we cannot tell a national supplier, such as Campbell Soup, as an illustration, that he must use our raw materials."

Although the Commission in its findings recognizes that "[t]he evidence may show that [Consolidated] has not thus far severely impaired competition in the industry by reciprocity * * *" even though Consolidated did "overtly exert this power on occasion with success" it concluded that "it seems clear that merely as a result of its connection with Consolidated, and without any action on the latter's part, Gentry would have an unfair advantage over competitors enabling it to make sales that otherwise might not have been made" and "the acquisition of Gentry by Consolidated has conferred upon the latter the power to foreclose competition from a substantial share of the markets for dehydrated onion and garlic, thereby jeopardizing the competitive opportunities of its small, relatively undiversified competitors and tending to lend further rigidity to an already heavily concentrated industry and to discourage the entry of new competitors, all 'without producing any countervailing competitive, economic, or social advantages'." On the basis of this conclusion, and subsidiary findings and conclusions under-

lying it, the Commission entered the divestiture order brought here for review.

The adverse effect upon competition requisite to application of the proscription of Section 7 of the Clayton Act and the invocation of the sanction of divestiture, is that the acquisition creates a reasonable probability of substantial injury to competition. "Mergers with a probable anticompetitive effect were to be proscribed * * *." Brown Shoe Co. v. United States, 370 U.S. 294, 323, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510. Thus the main issue presented for our determination in this review is whether the Commission's implicit finding and conclusion that Consolidated's acquisition of Gentry has the probably substantial anti-competitive effect proscribed by Section 7 of the Clayton Act is supported by substantial evidence on the record considered as a whole.

■ Undoubtedly there are situations resulting from acquisitions or mergers in which business reciprocity has the effect of substantially lessening competition or can be so utilized.[4] Where the probability of such an effect arising out of a merger or acquisition is demonstrated the requirements for application of Section 7 are satisfied. But our examination of the record in the instant proceeding fails to satisfy us that the Commission sustained its burden of showing that such a probability exists. In our appraisal of the substantiality of the evidence we must take into account whatever in the record fairly detracts from its weight. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. And here ten years of post-acquisition experience—during which Consolidated attempted overt enforcement of reciprocal buying practice where it deemed it might be successful— serves to demonstrate that neither the acquisition of Gentry, in and of itself, nor the overt attempts to use buying power to influence sellers to Consolidated to purchase from Gentry resulted in substantial anticompetitive effect. No substantial impact on the relevant market occurred, and absent some factor which requires a different approach we are of the view that the experience reflected by this post-acquisition period must weigh heavily in appraising future probabilities.

Consolidated's Gentry division in the years following the acquisition, during which time it improved its onion processing equipment to eliminate a problem arising from the presence of wood splinters and achieved a product of higher quality than that of its competitors, increased its share of the rapidly expanding market by only some 7% with respect to dehydrated onion while, during the same period, it sustained a decrease of some 12% in its share of the dehydrated garlic market. If the increase in Gentry's market share of its onion business were attributable to business reciprocity—implied or overt—it seems that it should have similarly affected Gentry's garlic business.

Moreover, in a number of instances where there were overt attempts to utilize reciprocity there was testimony that it had no effect. The witnesses attributed their purchases or increase in amounts purchased to such factors as quality, better service, need for an additional source of supply, type of containers furnished, etc., and denied that reciprocity practice was a motivating factor in making purchases from Gentry. In the face of what the Commission found to be a "burgeoning" industry, the slight gain in over-all market position as to dehydrated onion when viewed in the light of the more significant loss of position with respect to dehydrated garlic indicates not only that reciprocity had no substantial impact but also that there is no basis for rejecting the testimony that even the overt attempts to utilize reciprocity as an influence had little effect on the firms

---

4. See: Waugh Equipment Co., 15 F.T.C. 232; Mechanical Manufacturing Co., 16 F.T.C. 67 and California Packing Corp., 25 F.T.C. 379.

627

involved. And this would seem especially so in the case of nationally known and advertised brands which through consumer acceptance and loyalty would be relatively immune from individual wholesaler or retailer dictation of the source from which ingredients must be obtained. By 1958 over 25% of Gentry's sales were to seven such companies and over 90% of its sales were to customers who purchased annual quantities in excess of 10,000 pounds each.

■ Probability can best be gauged by what the past has taught. We are convinced that the Commission has mistakenly rejected what the record demonstrates as to the past in favor of a future possibility based on conjecture and speculation.

The petition of Consolidated is granted and the Commission's order is set aside.

Order set aside.