Bruce A. RYALS, Individually, et al.,
Plaintiffs,

v.

NATIONAL CAR RENTAL SYSTEM,
INC., a Nevada Corporation,
Defendant.

No. 4–74–Civ. 607.

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 24, 1975.

**482**

Joe A. Walters and John J. Sommerville, O'Connor & Hannon, Minneapolis, Minn., for plaintiffs.

Daniel R. Shulman, Gray, Plant, Mooty & Anderson, Minneapolis, Minn., for defendant.

## MEMORANDUM ORDER

LARSON, District Judge.

In this civil antitrust action, the Court has before it the motion of defendant National Car Rental System [National] to dismiss the complaint for failure to state a claim or, in the alternative, to limit the scope of the action in a variety of ways.[1] Oral argument was heard on the motion on March 11, 1975. Since the Court has received and considered affidavits and exhibits submitted by the parties, it will treat the dismissal motion as one for summary judgment under Rule 56. *See* 5 Wright & Miller, Federal Practice and Procedure: Civil § 1366 at 675–84 (1969). For reasons which will be set forth herein, the Court has concluded that the plaintiffs have failed to state a claim for which relief may be granted. Accordingly, the Court will grant the defendant's motion for dismissal.

The Court assumes, for purposes of this motion, that the facts are as the plaintiffs state them to be. In 1968, plaintiff Bruce A. Ryals [Ryals] became the sole stockholder and operator of a Pontiac and Buick automobile dealership located in suburban Orlando, Florida. The corporation established at that time, Ryals Pontiac Buick, Inc. [Dealership], is also a plaintiff herein. The third plaintiff, Bruce A. Ryals Enterprises, Inc. [Enterprises], also wholly owned by Ryals, owned the real estate upon which the Dealership was located.

National is a major car rental company with headquarters in Minnesota. Like most large car rental companies, it provides primarily new cars to its rental customers, continually replacing its rental inventory with new automobiles. The record shows that National uses almost exclusively cars produced by General

---

1. As an alternative to its claim for outright dismissal of the action, National contends that: two of the plaintiffs, Ryals and Enterprises, lack standing to assert any antitrust claims; all three plaintiffs lack standing to seek injunctive or declaratory relief; some, if not all, of the damage claims are barred by the four-year statute of limitations; and the alleged facts fail to state a violation of Clayton Act § 3, 15 U.S.C. § 14. Since the Court has determined that the allegations fail to state a claim under any of the Federal antitrust statutes, it will not deal with these sub-issues.

Motors Corporation [GM], the automobile manufacturer which supplied the Ryals Dealership with its inventory.

Beginning in the summer of 1969 Ryals approached National about the possibility of making fleet sales to the latter. National expressed an interest in purchasing a fleet of GM automobiles if the Dealership would agree to a mandatory "buy-back" provision, under which National would have the option to tender the cars to the Dealership for repurchase within a maximum of six months from date of delivery at a predetermined price. Ryals asked if it would be possible to negotiate fleet sales without such a buy-back provision, but National replied that the buy-back condition was a requirement of company policy from which it would not deviate. Ryals then consented to the condition and a set of purchase agreements was executed in August of 1969. Under the agreements National was to pay for the automobiles at $50.00 above "factory price." The Dealership was also able to retain a two percent dealer or factory "holdback" on each car, presumably through its contract with GM. Within six months of the sale National could call on Ryals to repurchase the cars at the original price minus a 2.2% per month depreciation. Each car so returned was to be "washrack clean" and was to have accessories and equipment similar to those originally on the car. The Dealership was to accept the cars back subject only to normal wear and tear. National was also given an option to purchase replacement automobiles for any of the original cars redelivered to the Dealership under the buy-back clause; the purchase of such replacement automobiles was to be pursuant to the same sale and buy-back provisions as governed the original fleet purchase.

Pursuant to this first set of purchase agreements executed in 1969, the Dealership delivered cars to National in the fall of 1969 and was paid in full. In early 1970, National exercised its option to resell the cars to the Dealership and simultaneously exercised its option to purchase a replacement fleet from the Dealership. Both parties made payment in full for the automobiles received by each. In the fall of 1970 National tendered the replacement fleet back to the Dealership for repurchase, and the Dealership received the cars and made full payment for them.

In August of 1970 a second series of vehicle purchase agreements was entered into between the parties, this time covering the 1971 model year. Once again, prior to the execution of the agreements, Ryals asked if it would be possible to omit the buy-back condition, but National insisted on its retention. Pursuant to the August 1970 agreements the Dealership delivered new cars to National in the fall of 1970 and received payment therefor. In April and May of 1971 National began returning these cars to the Dealership for buy-back, simultaneously taking delivery of replacement cars from the Dealership. Among the automobiles delivered by National for buy-back in May of 1971 were eighty-eight cars having a buy-back purchase price of $301,-992.37. Although all eighty-eight cars were quickly disposed of, the Dealership failed to pay for them, in large part because an auction company to which some of the cars had been consigned for resale became insolvent and failed to pay the proceeds of the resale over to the Dealership. Ryals owned one-third of the stock of the auction company.

At the time when the Dealership found itself unable to fulfill its buy-back payment obligation, National owed the Dealership several hundred thousand dollars for replacement automobiles which it had just purchased. Under the agreement between National and the Dealership, National had the right to offset the debt and to refuse to pay the amount owing on the new cars. At first it expressed to the Dealership its intention to exercise that right of offset. However, after a series of negotiations between the parties, National paid several hundred thousand dollars to the

Dealership on its replacement vehicle obligation in June of 1971, in exchange for an agreement signed by all three plaintiffs guaranteeing payment of the approximately $301,000 still owing under the buy-back agreement. The settlement was short-lived, for in August of 1971 National brought an action in Florida State court against all three plaintiffs herein, seeking to recover the amount still owing on the guaranty. *National Car Rentals* [*sic*] *v. Ryals Pontiac, Buick, Inc. et al.*, No. 71–5048 (Ninth Judicial District, Orange County, Fla.). The plaintiffs herein defended on the basis of lack of consideration and economic duress, and also claimed that the amount sought by National was excessive. In December of 1971 the State court entered judgment against Ryals, Enterprises and the Dealership for $301,992.37 and attorneys' fees. National levied on their property in February of 1972, thereby reducing the amount owing on the State judgment to approximately $250,000. At about the same time the Dealership ceased doing business.

The plaintiffs commenced this antitrust action for damages and injunctive relief on November 27, 1974. In their complaint, as amended, they contend that National:

". . . has used its substantial economic power and dominant position both as a purchaser of new cars and seller of current-model used cars to coerce automobile dealers, including Plaintiff Dealership, to enter into reciprocal contracts . . . resulting in an unreasonable and appreciable restraint on free competition . . . in violation of . . . Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S. C. § 14 . . . . ."

They also contend that:

". . . Defendant by employing the aforestated practice of reciprocal dealing attempted, with the requisite intent and dangerous probability of success, to monopolize and did monopo-

lize the market for current-model used Pontiac and Buick automobiles in the Orlando, Florida area, in violation of Section 2 of the Sherman Act, 15 U.'S. C. § 2."

The plaintiffs' theory of liability is perhaps best summarized in their memorandum opposing the defendant's motion to dismiss:

". . . Defendant has used its purchasing power in the new car market to promote the sale of its products in the used car market. Through its reciprocal dealing, Defendant is able to completely avoid and frustrate the competitive forces in the used car market. This is reciprocal dealing in its clearest form."

The complaint and plaintiffs' memorandum establish that the sole target of their charges is National's practice of insisting on a buy-back clause in its automobile purchase contracts.

■ The Court acknowledges the oft-stated principle that summary judgment in antitrust actions is disfavored as an extreme sanction, particularly at an early stage in the proceedings where, as here, the defendant has not yet filed an answer. *See Ozark Milling Co. v. Allied Mills, Inc.*, 480 F.2d 1014, 1015 (8th Cir. 1973). Nevertheless, there are rare occasions when contrary principles come into play, and when none of the participants in the litigation process will benefit from further deliberation and delay. A court ought not engage in needless and time-consuming efforts to prune down a lawsuit which is doomed from the outset to eventual dismissal. This Court believes that the underlying theory of liability urged by the plaintiffs in this action is without merit, and has concluded that this is one of those rare antitrust actions in which summary judgment is appropriate. *Cf. Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289 at 297 (8th Cir. 1975).

■ The magic phrase by which the plaintiffs seek recovery in this action is

"reciprocal dealing." As one commentator has defined it,

"[r]eciprocal dealing is both the use of purchasing power to obtain sales and the practice of preferring one's customers in purchasing. . . . [R]eciprocity can be an effective way to improve sales and to deny competitors equal access to the market . . . .

\* \* \* \* \* \*

"A firm that buys a substantial dollar amount of a product has enough power to induce some others to reciprocate, because reciprocity does not seem costly. (The participant's competitors, strangers to the transaction, are the victims.) . . . ."

Hausman, *Reciprocal Dealing and the Antitrust Laws*, 77 Harv.L.Rev. 873, 884 (1964). As stated in ABA, *Antitrust Developments* 11 (1968): "the central core is the use of purchasing power to promote sales." The plaintiffs accept these definitions of reciprocity, as does this Court, and contend that the buy-back condition falls within the definitions. They argue that National has used its purchasing power in the new car market to promote sales in the used car market.

While the amount of caselaw devoted to reciprocal dealing is still quite small, there can be no doubt that under many circumstances reciprocity is a violation of the antitrust laws. Three FTC proceedings in the 1930's established that coercive reciprocal dealing is a violation of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. *See California Packing Corp.*, 25 F.T.C. 379 (1937); *Mechanical Mfg. Co.*, 16 F.T.C. 67 (1932); *Waugh Equip. Co.*, 15 F.T.C. 232 (1931). *See generally* Hausman, *supra*, at 884–85. The Supreme Court held in *FTC v. Consolidated Foods*, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965), that § 7 of the Clayton Act, 15 U.S.C. § 18, is violated when a merger creates the probability of reciprocal dealings. Lower Federal courts have concluded that reciprocity may violate §§

1 and 2 of the Sherman Act. The reasoning behind this conclusion is perhaps best stated in *W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 381 F.Supp. 680, 703 (D.Del.1974):

". . . [T]his Court has no difficulty in concluding that if corporate mergers can be unlawful under Clayton Act § 7 because of the *potential* they create for reciprocal dealing, the actual practice of reciprocity can also violate the antitrust laws. Thus, a contract, combination, or conspiracy to engage in reciprocal dealing can restrain trade in violation of Sherman Act § 1. Two courts have already adopted this position. *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3 (4th Cir. 1971); *United States v. General Dynamics Corp.*, 258 F.Supp. 36 (S.D.N.Y.1966). Similarly, although this Court has found no cases so holding, use of reciprocity to monopolize or to attempt to monopolize interstate commerce can, upon a proper factual showing, violate Sherman Act § 2. What is prohibited is the use of buying power in one market to cause an injury to competition in another market."

*See also Carlson Companies v. Sperry & Hutchinson Co.*, 374 F.Supp. 1080, 1093–98 (D.Minn.1974); *Stavrides v. Mellon National Bank & Trust Co.*, 353 F.Supp. 1072, 1077 n. 6 (W.D.Pa.), *aff'd per curiam*, 487 F.2d 953 (3d Cir. 1973). The reciprocal dealing need not be coercively obtained to violate the antitrust laws, for

". . . the antitrust laws are not designed merely to protect the individual merchant from coercion and other predatory practices. 'The legislation . . . is intended to preserve free competition. Reciprocity, whether mutual or coercive, serves to exclude competitors by the exercise of large scale purchasing power.' *United States v. General Dynamics*, [*supra* 258 F.Supp. at] 66 . . . ." *Columbia Nitrogen Corp. v. Royster Co.*, *supra*, 451 F.2d at 14.

This Court fully agrees with the above cited cases that the practice of reciprocal dealing is both pernicious and vulnerable under the Sherman Act. The Court grants summary judgment for the defendant in this action not because of any reluctance to condemn the practice of reciprocal dealing but because the plaintiffs have not alleged facts sufficient to establish that the defendant has in fact engaged in reciprocal dealing within the meaning of the antitrust laws.

▮▮▮▮ The plaintiffs' efforts to characterize the buy-back condition as an instance of reciprocal dealing must fail for two reasons. First, notwithstanding the obvious truth of plaintiffs' affidavits to the effect that new and current model used cars appeal to separate consumer markets, the Court is convinced that the particular automobiles purchased by National and returned to the Dealership within six months constituted the same product. In all cases which have previously condemned reciprocal dealing, the danger, real or potential, was that the defendant's use of its purchasing power in one product market had induced his trading partner to reciprocate by buying a different product from the defendant.[2] The latter product, analogous to the "tied" product in tying cases

under § 3 of the Clayton Act, was purchased from the defendant not because of its superior price or quality, but in exchange for other transactions. As a result, the market for the "tied" product became distorted and competitors in the "tied" product market were foreclosed from competing on the merits. Under the logic of the caselaw, this Court might condemn an arrangement whereby National purchased *some* of its new car requirements from the plaintiffs only on condition that the plaintiffs purchase either *all* of National's used car output or used cars which had not been originally acquired from the plaintiffs. But here the used car returned to Ryals is the identical automobile, reasonable wear and tear excepted, as had previously been purchased from Ryals. Any doubt that the entire transaction involves only one product is removed when one compares the purchase and buy-back agreement actually used with an alternative arrangement which could have been employed to reach the identical end result: a six-month lease to National with an option to buy. There is no difference in substance between these two alternatives; both yield identical ultimate results in the marketplace, since the Dealership ends up with the current model used cars.[3] Yet the lease with

2. In *Waugh Equip. Co.*, 15 F.T.C. 232 (1931), and *Mechanical Mfg. Co.*, 16 F.T.C. 67 (1932), individuals connected with Armour & Co. and Swift & Co., respectively, acquired railway equipment manufacturing companies. By promises of continued traffic, threats to withdraw traffic, and actual traffic diversions, they induced the railways to buy their equipment, sometimes against the advice of railroad engineers. In *California Packing Corp.*, 25 F.T.C. 379 (1937), a packer of foodstuffs, by the same means, forced suppliers and transport companies to patronize its subsidiary terminal corporations, often at noncompetitive prices. In *FTC v. Consolidated Foods*, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965), the FTC found that the defendant, a large food processing plant, might be able to induce its suppliers to reciprocally purchase dehydrated onion and garlic produced by a newly acquired subsidiary. Lower court cases condemning reciprocal dealing similarly involve

two distinct products. *See, e.g., Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3 (4th Cir. 1971) (nitrogen and phosphates); *W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 381 F.Supp. 680 (D.Del.1974) (conducting material and cable); *United States v. General Dynamics Corp.*, 258 F.Supp. 36 (S.D.N.Y.1966) (75% of defendant's suppliers of a wide variety of products used carbon dioxide, a product produced by a newly acquired subsidiary of defendant).

3. The defendant also points out that the sale and buy-back arrangement was more beneficial to the Dealership than the lease with option to purchase discussed in the text. Under the sale and buy-back arrangement the Dealership . immediately obtained the money needed to pay its inventory financer, had use of the full purchase price for approximately six months, and was able to immediately transfer the risks, expenses, and obligations of fleet ownership to National.

purchase option can in no way be categorized as involving more than one product: the specific automobile which is used by National for six months and then returned to the Dealership. Nor can the lease with purchase option be characterized as reciprocal dealing, without establishing an absurd rule whereby any contract involving mutual obligations is an exercise in reciprocity. The antitrust laws are concerned with results—specifically the result of anticompetitive effect—not form. The substance of a lease with purchase option would not amount to reciprocal dealing, and this Court will not find reciprocity where only the form of the transaction is altered. The statute does not condemn the defendant's conduct merely because it chose the only one of two alternative means to a particular result which is capable of being semantically subdivided into an exchange of two products.

■ There is a second and more fundamental reason—not dependent on the vagaries of whether new and used cars are separate products—for concluding that the plaintiffs have failed to state a claim under the antitrust laws. That is this Court's conclusion that the buy-back feature did not itself cause any anticompetitive effects. The record shows, and the plaintiffs do not deny, that whatever monopoly [4] National had in the Orlando market area for current model used cars was a totally unavoidable side-effect of National's business practice of supplying its rental customers with new cars. Under the circumstances, the method which National chose to rid itself of its inevitable accumulation of used cars was no more evil or anticompetitive than any reasonable alternative means of disposition.

The plaintiffs do not contend that National's status as the major source of current model used cars in the Orlando area is itself the result of any antitrust violation. They do not claim that National has violated any antitrust laws by its business practice of using only new GM cars for six months or less, a practice which makes inevitable National's status as the dominant source of current model used GM automobiles in the Orlando area. Thus, at least within the confines of this lawsuit, nothing that this Court can do will alter the inevitable "monopoly" position held by National in the current model used car market. The Court cannot order that the defendant push its used cars into the sea, rent the cars until the motors fall out, give them away, or sell them only at prices to be fixed by the Court. For purposes of *this* lawsuit, whatever monopoly power National has in the current model used car market is an inevitable outgrowth of structure, is not the result of challenged behavior, and is irremediable.

The plaintiffs' attack on the buy-back condition must therefore be placed in the perspective of an irremediable "monopoly" which already carries with it all of the usual disadvantages of a noncompetitive market structure. The plaintiffs attack only the *means* by which National has attempted to extricate itself from its unavoidable glut of current model used cars; they challenge only the manner in which National has exercised its unavoidable monopoly power. Even under the strictest standards imaginable under the antitrust laws this Court can condemn those means only if it is satisfied that the buy-back technique has further impaired the already anticompetitive market structure and is somehow more harmful to competition than other options open to National. Moreover, within the confines of this particular lawsuit this Court can condemn the buy-back condition only if it is satisfied

Since the lease with option to purchase would not have been a violation of the antitrust laws, the sale and buy-back, yielding identical ultimate results, but in more beneficial form to the Dealership, is *a fortiori* not a violation of the antitrust statutes.

4. The Court has assumed for purposes of this opinion that the plaintiffs' allegation that National had a "monopoly" in a distinct market for current model used cars in the Orlando area is accurate.

that *these plaintiffs* have been harmed by that condition.

The actual effect of the buy-back condition is, of course, dependent on the manner in which the market was operating and would operate absent its use. As the Court views the matter, the market may have been operating in one of three possible ways, depending on the actual mix of supply and demand. Under none of the possible market conditions does National's use of the buy-back provision aggravate the anticompetitive effects which already existed given its inevitable monopoly.

A first possibility is that current model used cars may have been in great demand, much sought after by used car dealers and consumers alike. Portions of the plaintiffs' memorandum proceed on this theory, and this seems to have been the theory underlying the defendant's brief. If this market picture is accurate, what in fact happened was that the defendant's inevitable monopoly was simply returned to the plaintiffs, for the plaintiffs to exploit as they wished. In the competitive market, absent the buy-back agreement, consumers and other dealers bidding for the shortage would not have given National a *lower* price than it got from the Dealership, but would rather have bid up the price. Thus, the Dealership was not harmed by being forced to pay too much for the used cars. The ultimate consumers, while they may have been harmed by the fact of the inevitable monopoly, were not harmed by anything in the buy-back agreement; enforcement of that agreement merely substituted a new monopolist (plaintiffs) for the old one (National). Nor were the rival dealers harmed by the buy-back agreement, except to the extent that the plaintiffs' position in the market was enhanced—an enhancement which would have taken place under a lease with option to buy in any event. Had there been no buy-back agreement, the rival dealers would have had to purchase their used automobiles from the monopolist National; presumably, with

the short supply, these dealers would have bid up the price received by National so that National, rather than the plaintiffs, would have reaped the monopoly profits.

A second possibility is that current model used cars may not have been in high demand, but may instead have been unwanted surplus. If this market picture is accurate, National simply drove a hard bargain with the plaintiffs, making them absorb the "waste product" inevitable to National's business. The same result would have occurred had the defendant leased the automobiles from the plaintiffs. Given such a market, National's guaranty that the plaintiffs would be stuck with the ultimate disposition of all of its used cars cannot be construed as an attempt to monopolize the market, for in times of surplus the true monopolist acts to withhold his product from the market; National, of course, did precisely the opposite. The ultimate consumers of current model used cars were not harmed by anything in the buy-back agreement unless the plaintiffs held cars off the market for the purpose of driving up the price—a contingency for which National can certainly not be held responsible. The only harm to the plaintiffs, if the market was of this nature, was their loss in having to take a lesser profit in the entire transaction. The plaintiffs surely weighed this consideration at the outset of the contract and, had they believed this harm to be of sufficient magnitude, they would not have entered the contract. There may conceivably have been harm to rival dealers by granting the monopoly, albeit of a surplus product, to the plaintiffs, but such harm is not of the type for which the plaintiffs can recover, since they were the beneficiaries of that harm. Moreover, the only way to cure that harm would be to force National to sell its used cars to more than one used car outlet—in other words, to force National to exercise its monopoly power for its own benefit.

A third possibility is that the market may have been a mixture of the above

two situations, occasionally experiencing a glut of current model used cars, and at other times experiencing a shortage of such cars. Portions of the plaintiffs' brief employ this picture of the market, particularly insofar as they refer to Ryals' deposition wherein he stated that his basic objection to the buy-back provision was that it required the plaintiffs to gamble against the future price of used cars in the free and competitive market. Seen in this light, the plaintiffs' claim of an antitrust violation is reduced to the assertion that it was a violation of the Sherman Act for National not to take that gamble upon itself. Obviously, such an argument does not state a claim under the antitrust laws. Had National taken that gamble upon itself, directly controlling the sale of its own used cars, it might have been accused of monopolizing the market in the current model used cars.[5] To accept the plaintiffs' contention of an antitrust violation under the market conditions posited in this third view would be to subject National to a situation in which it could be condemned whatever course of action it chose to pursue.

Finally, the plaintiffs have not suggested, nor has this Court been able to foresee, any alternative approach which would be at once less harmful to competitors of the plaintiffs in the current model used car market and less harmful to the plaintiffs. In sum, defendant National was faced with the inevitable prospect of disposing of large numbers of current model used cars. No matter what the market conditions were in fact, the manner chosen to accomplish this disposition was no more anticompetitive than any reasonable alternative, caused no harm to the plaintiffs, and is not actionable under the antitrust laws.

It is ordered:

That the defendant's motion for dismissal be, and is hereby, granted.

Judgment will be entered accordingly.

---

5. Indeed, the plaintiffs contend that National has violated Sherman Act § 2 because:

   " . . . Defendant consciously used its vast purchasing power in the new car market to manipulate the wholesale and retail prices of current-model used Pontiacs and Buicks in the greater Orlando, Florida area. . . ."

   This is precisely what National could have done had it *not* returned all of its used cards to the plaintiffs under the buy-back agreement. The facts show that National did not "manipulate" the prices for used cars. On the contrary, during the period in question, it returned all cars at 2.2% per month depreciation. The price was originally set by GM, and the money which National received in returning its used automobiles was derived by application of a rigid formula to that original price. Obviously, the formula was not responsive to supply and demand in the used car market. One can hardly imagine a clearer case of an absence of manipulation by National.