**EKCO PRODUCTS COMPANY,**
**Petitioner,**
**v.**
**FEDERAL TRADE COMMISSION,**
**Respondent.**
**No. 14773.**

United States Court of Appeals
Seventh Circuit.
June 21, 1965.

Bryson P. Burnham, George V. Bobrinskoy, Jr., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for petitioner.

J. B. Truly, Asst. Gen. Counsel, Harold A. Kennedy, Atty., Federal Trade Commission, Washington, D. C., James McI. Henderson, Gen. Counsel, Frederick H. Mayer, Atty., Federal Trade Commission, for respondent.

Before HASTINGS, Chief Judge, and DUFFY and CASTLE, Circuit Judges.

HASTINGS, Chief Judge.

We have before us the petition of Ekco Products Company for review of an order of the Federal Trade Commission. After the conclusion of an administrative proceeding, the Commission held that Ekco had violated Section 7 of the Clayton Act, Title 15 U.S.C.A. § 18, 64 Stat. 1125 (1950).[1]

Ekco was found to have violated Section 7 by its acquisition in June, 1954 of McClintock Manufacturing Company and by its subsequent purchase in May, 1958 of certain assets of Blackman Stamping & Manufacturing Company.

The acquisition of McClintock was conglomerate in nature, since Ekco had not theretofore been engaged in the relevant line of commerce and McClintock had been neither a supplier nor a customer of Ekco. That is, the acquisition of McClintock was neither vertical nor horizontal as those terms have been conventionally used.

In brief, the Commission's order would require Ekco to divest itself of all assets acquired from McClintock, together with all additions thereto and replacements thereof, "as may be necessary to reconstitute McClintock Manufacturing Company as a going concern and effective competitor in the manufacture and sale of commercial meat-handling equipment."

The complaint in this case was issued by the Commission on September 26, 1960. It alleges in substance that Ekco is a leading producer of commercial food and meat-handling equipment and containers, including kitchen tools, tinware, cutlery, stainless steel cooking utensils, flatware and other similar items. It is the largest manufacturer of baking pans for commercial and industrial uses.

That between 1950 and 1959, Ekco's net sales rose from $36.8 million to $73.6 million and its net worth from $19.2 million to $43.7 million, largely as a result of more than twenty acquisitions.

That Ekco distributes its products through subsidiaries or sales divisions to some 10,000 customers throughout the United States, with the commercial meat-handling equipment being sold with building hardware in a separate division.

The complaint further avers that Ekco acquired McClintock on June 30, 1954 for a consideration of about $783,000. That prior to the acquisition, McClintock was engaged primarily in the manufacture and sale of a complete line of commercial meat-handling equipment, consisting of aluminum platters, pans, lugs (deep pans), and metal racks and carts used by supermarkets and grocery stores in handling, storing and transporting meat. In addition, McClintock made and sold or leased rubber greens, used for decorative purposes in meat markets and meat departments of food establishments.

It is alleged that, prior to its acquisition, McClintock was by far the largest

1. The pertinent part of Section 7 provides: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

producer of commercial meat-handling equipment in the United States, with sales of such equipment in 1953 amounting to approximately $700,000 out of its total sales of about $1.5 million. That it sold the equipment to supermarkets, grocery stores, distributors and jobbers.

That no other company competed nationally with McClintock in the manufacture and sale of this equipment, and that McClintock enjoyed a virtual monopoly in this field.

That during the year following the acquisition of McClintock, Blackman entered the field as the only company, other than Ekco, producing a complete line of commercial meat-handling equipment sold throughout the United States. That one other company, Chesley Industries, Inc., came into the national market about that time, but its sales were confined to a limited line of this equipment.

It is alleged that in 1957 total sales of the three national producers of commercial meat-handling equipment aggregated $1,278,159, of which Ekco accounted for $1,064,169, or 83.3 percent, and Blackman for $99,990, or 7.8 percent.

That after unsuccessfully attempting to acquire Chesley, Ekco purchased in May, 1958 for $142,335 that part of the business of Blackman devoted to the production and sale of meat-handling equipment, leaving Chesley the only remaining national competitor. That on the basis of the 1957 sales data, the purchase of the relevant part of Blackman's assets increased Ekco's market share from 83.3 percent to 91.1 percent.

The complaint then charges, in substance, that Ekco's acquisition of McClintock and Blackman may substantially lessen competition or tend to create a monopoly in the manufacture and sale of commercial meat-handling equipment in violation of Section 7 of the Clayton Act because of the following alleged effects: Elimination of two out of only three national companies in the commercial meat-handling equipment market; foreclosure of the sole remaining national rival, as well as potential future producers, from competing with Ekco owing to the latter's financial and economic strength, its power and ability to control prices and selling terms, its dominant and monopolistic position as the only producer in the United States of a complete line of commercial meat-handling equipment, and its demonstrated ability to erase competition by acquiring or buying out rival producers and sellers of this equipment.

In its answer to the Commission's complaint, Ekco admits, with minor qualifications, most of the relevant facts, but denies the conclusion that its acquisitions violated Section 7 of the Clayton Act.

During the hearings held before an examiner between August, 1961 and September, 1962, complaint counsel presented evidence in support of its case as alleged in the complaint, at the conclusion of which Ekco did not introduce evidence in its defense. During Ekco's cross-examination of Commission witnesses, several exhibits offered by Ekco were received in evidence.

On the record thus adduced, the hearing examiner filed his initial decision, made detailed findings of fact, held that the evidence did not establish a violation of Section 7 of the Clayton Act and dismissed the complaint.

The examiner dismissed the complaint primarily on the ground that owing to ease of competitive entry by others into the commercial meat-handling market and "the presence of substantial actual and incipient competition," the McClintock acquisition did not run afoul of Section 7 of the Clayton Act.

As for the Blackman asset acquisition, the examiner found that subsequent dissipation of all its assets thereby acquired rendered divestiture of such acquisition moot.

The examiner made no findings concerning Ekco's post-acquisition conduct pleaded in the complaint, holding such evidence to be irrelevant in a Section 7 case.

On appeal from the initial decision of the examiner, the Commission adopted virtually all his findings of fact, considering them to be largely undisputed, but reversed the examiner's ultimate conclusion and dismissal of the complaint and held instead that Ekco had violated Section 7 of the Clayton Act. It accompanied this holding with an extended memorandum opinion in which it treated specifically the details of its disagreement with the conclusions reached by the examiner.

The Commission then requested further briefs relating primarily to the question of the appropriate form of relief to be fashioned in its final order. On consideration of such briefs, the Commission reaffirmed its holding that Section 7 had been violated and entered the order of divestiture now before this court, accompanied by a second opinion explaining the reasons for its remedial action.

For purposes of clarity, we have set out the Commission's final order in full as Appendix A to this opinion.

Both parties to this review agree there is no material dispute concerning the relevant facts in this case and that the ultimate issue for determination is a question of law—whether Ekco's challenged acquisition of McClintock violated Section 7 of the Clayton Act.

Certain facts material to the resolution of this question of law seem clearly established.

The relevant line of commerce involved in this case is commercial meat-handling equipment, consisting of two different kinds of equipment with related uses: (1) anodized aluminum platters, pans and lugs used for handling, storage and display of meats in retail meat markets; and (2) metal racks and carts used for the storage and handling of such platters, pans and lugs in such stores. Commercial meat-handling equipment is extremely durable, hence, the replacement market is negligible.

The market for meat-handling equipment is largely confined to meat department in retail food outlets and the cost of this equipment to such a department is about $1,000. It appears that the commercial meat-handling equipment industry as a whole is not large. The largest annual industry-wide sales volume of platters, pans and lugs was approximately $1,000,000.

While the statistical market picture for carts and racks is somewhat less complete, the figures for three of the principal companies in this field show the largest annual sales total to be only slightly over $300,000. However, the parties agree we are not concerned with a *de minimis* argument in this review.

Ekco is one of the nation's largest manufacturers of kitchen tools, tinware and cutlery and is one of the leading companies in other product fields. It is the principal manufacturer of commercial baking pans. Since 1952, it has manufactured large aluminum meat boxes.

It is admitted that prior to its acquisition by Ekco in 1954, McClintock enjoyed a virtual monopoly in the manufacture and sale of anodized platters, pans and lugs and was the nation's largest producer of metal racks and carts that hold such platters, pans and lugs. No complaint is made here concerning the monopoly position of McClintock in platters, pans and lugs.

In 1953, McClintock expanded into the manufacture and sale of commercial baking pans, a field in which Ekco was the largest producer.

It is conceded that at the time of its acquisition by Ekco, McClintock was in a relatively healthy condition financially and was not a failing company. However, McClintock's cash position declined between 1952 and 1954 by 29 percent, notwithstanding its increase in sales by 78 percent during the same period. McClintock had never paid any dividends. Its operations were restricted by the terms of a loan agreement that required it to maintain net current assets of $200,000 and prohibited dividend disbursements and other material expenditures without prior consent of the lending bank.

Blackman was induced to enter the commercial meat-handling business by two sales promoters who wanted to engage in the platter and pan business. However, due to failure to make a proper market survey, Blackman tooled up to produce a complete line of many sizes of pans, which later was shown to have been a mistake. Sales did not meet expectations and the business investment was greater than anticipated. Its 1958 assets totaled $213,000.

Early in 1958, Richard Blackman, the owner, learned he was suffering from incurable cancer. He decided to sell the tools, dies and inventory of the commercial meat-handling part of his business in order to leave his jobshop stamping business in sound condition. After two unsuccessful attempts to sell, he made contact with Ekco and sold such assets to it in May, 1958, including inventory at cost price of $100,000 and the dies at $42,300.

Ekco had been contemplating the manufacture of commercial meat-handling equipment in Canada. It sent the Blackman dies to its Canadian subsidiary. This venture proved to be disappointing and Ekco abandoned it, disposing of the dies. It had long since used the Blackman inventory in the ordinary course of business. Nothing remains in Ekco's hands of the assets acquired from Blackman.

It is clear that national competition in the field, other than by McClintock, Chesley and Blackman, is not an important factor. It consists generally of a large number of local metal stamping concerns and manufacturers of refrigerated display cases. There also appears some likelihood of competition from the plastics industry.

Prior to its acquisition by Ekco, McClintock had operated in a leased plant in the Los Angeles, California area. After the acquisition, it was moved into another plant owned and operated by Ekco in the same area and using slightly smaller floor space.

Ekco's McClintock Division continued to manufacture and sell the line under the McClintock name as McClintock had done before, using generally the same personnel. The examiner found that Ekco had not infused the McClintock operation with capital or assets from any other part of its business. However, within six months after the acquisition, Ekco liquidated the 90 percent unpaid balance of the bank loan of $200,000 and increased McClintock's cash resources by about 132 percent.

An analysis of the relative sales position of each of the competitors in the market for platters, pans and lugs between 1955 and 1960 is reflected in the following tabulation:

Percentage Share of Each Company in Total Sales
of Commercial Meat-Handling Platters
Pans, and Lugs, 1955–1960

|  | 1955 | 1956 | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|---|---|
| Ekco (McClintock) | 93.0 | 76.3 | 76.7 | 76.1 | 88.2 | 90.3 |
| Blackman | — | 11.6 | 9.7 | 10.4 | — | — |
| Chesley | 1.9 | 7.6 | 8.8 | 6.5 | 5.5 | 3.7 |
| Eastern Steel Rack | 0.7 | 0.7 | 0.8 | 0.7 | 0.7 | 0.7 |
| Friedrich Refrigerators, Inc. | (a) | (a) | (a) | (a) | (a) | (a) |
| C. V. Hill & Co. | 4.0 | 3.4 | 3.8 | 3.4 | 3.1 | 2.8 |
| Hollywood Plastics, Inc. |  |  |  | 2.6 | 2.4 | 2.3 |
| All companies | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

From the foregoing data, we see that after its acquisition Ekco (McClintock) remained in a dominant position. Also, that Chesley and Blackman, after their entry, reduced Ekco's share of the market from 93 percent in 1955 to 76.1 percent in 1958. Further, that after the Blackman elimination by Ekco in 1958, its share rose to 90.3 percent in 1960. Chesley reached a peak of 8.8 percent in 1957 from a start of 1.9 in 1955. However, with Blackman out of the picture, Chesley dropped to 3.7 percent in 1960.

While the data is less complete concerning the market shares of the three principal competitors in the field of carts and racks, the following summary reflects their relative position for the four-year period shown:

Percentage Shares of Principal Competitors in Total
Sales of Commercial Meat-Handling Carts
and Racks, 1955–1958

|  | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|
| Ekco (McClintock) | 98.3 | 96.5 | 86.9 | 81.9 |
| Blackman | — | — | 3.8 | 9.3 |
| Chesley | 1.7 | 3.5 | 9.3 | 8.8 |
| All three companies | 100.0 | 100.0 | 100.0 | 100.0 |

This does not take into account the shares of a number of lesser competitors, local in nature or whose products are used for other than commercial meat-handling purposes. Their total market share may be considered as much less than substantial.

The foregoing makes evident that Ekco's reduction of 98.3 percent in 1955 to 81.9 percent in 1958 was a result of the Chesley and Blackman appearance. It follows that upon Blackman's elimination Ekco's share was raised to more than 90 percent.

Thus, it must be concluded that in the relevant line of commerce, through the McClintock acquisition, Ekco was enabled to acquire and maintain a strong monopoly position.

Aside from any effects that may be attributable to Ekco's acquisition of McClintock and purchase of Blackman assets, it seems established that there are no high barriers to entry into the commercial meat-handling equipment business. Necessary capital requirements are not large, raw materials are in ample supply and distribution outlets are readily available.

Ekco and the hearing examiner consider the McClintock acquisition to be a conglomerate merger. The Commission disagrees and characterizes it as a product-extension acquisition, since Ekco "was already the largest manufacturer of commercial baking pans, a related product line, and was also engaged in the production of aluminum meat boxes." See The Procter & Gamble Company, 3 CCH Trade Reg.Rep. ¶ 16,673 at 21,565–66 (Nov. 26, 1963).

This divergence of views may be somewhat academic. However, as Ekco points out, since prior to its acquisition of McClintock, Ekco had not been engaged in the manufacture or sale of commercial meat-handling equipment and since Ekco and McClintock had not been actual or potential customers or suppliers of each other, nor had they distributed their respective products in the same channels of trade, the McClintock acquisition was neither vertical nor horizontal. Hence, it must have been conglomerate in char-

acter, as we understand the conventional use of that term.[2]

If we are to have a different standard or set of rules, aside from those applying to vertical and horizontal combinations, to test the illegality of conglomerate mergers and product-extension acquisitions in cases brought under Section 7 of the Clayton Act, we feel compelled to look to the Supreme Court for guidance.

In any event, it seems clear that all such mergers are within the reach of Section 7, regardless of their classification.

After a careful study of the few cases which have dealt with conglomerate mergers under Section 7, articles on this subject and the record in this case, we conclude that the Commission's order should be enforced.

We have found no bright light in the cases and articles brought to our attention thus far which shines on the narrow and somewhat unique factual situation presented for review here.

In the McClintock acquisition, Ekco acquired a virtual monopoly. The legality of the McClintock monopoly is not questioned here. There seems to be agreement that the purchase of the Blackman assets was a horizontal acquisition, unlawful *per se.* Yet, the Commission found it to be unrealistic to require remedial action as to those assets, long since dissipated.

The Commission disagreed with the examiner's holding that all post-acquisition evidence was irrelevant and could not be considered. It ruled that such evidence is significant when *causally* related to an acquisition. It found such causal relationship in the Blackman assets purchase since it further found that an independent McClintock company *probably* could not have bought these assets. It regarded the Blackman purchase as a concrete illustration of how the McClintock acquisition contributed to the entrenchment of McClintock's monopoly in

the commercial meat-handling equipment field; that is, it had enabled the elimination of Blackman as a direct, horizontal competitor in that field.

In Federal Trade Commission v. Consolidated Foods Corporation, 85 S.Ct. 1220 (April 28, 1965), the Supreme Court gave controlling dispositive attention to the consideration of post-acquisition evidence. It held that we were "not in error in considering the post-acquisition evidence" in the case, but that we erred in that we "gave too much weight to it," and "almost conclusive weight." Id., 85 S.Ct. at 1224.

Ekco argues that the Commission, in deciding this case, applied a new but erroneous rule of *per se* illegality, viz., that Section 7 is violated where a small company which possesses a large share of the relevant market is acquired by a larger company. Ekco states that "the Commission's decision has treated Section 7 as if it contained a blanket prohibition against *all* acquisitions of small companies by large companies, regardless of the circumstances." We disagree.

The fact that a large corporation purchases a corporation with a virtual monopoly in its field does not, by that fact alone, render the merger violative of Section 7. However, such fact may subject the merger to careful scrutiny to determine if additional facts exist from which a violation may be found. See United States v. Philadelphia Nat. Bank, 374 U.S. 321, 365 n. 42, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) and Procter & Gamble Co., F.T.C. Docket 6901, p. 28 at 60 (Nov. 26, 1963).

The Supreme Court in Consolidated Foods, supra, considered the market size of the acquired firm. It stated, "We do not go so far as to say that any acquisition, no matter how small, violates § 7 if there is a probability of reciprocal buying. Some situations may amount only to *de minimis.* But where, as here, the acquisition is of a company that com-

2. For a thoughtful analysis of this general subject matter, see Turner, Conglomerate Mergers and Section 7 of the Clayton Act,

78 Harv.L.Rev. 1313 et seq. (1965).
See also, Federal Trade Commission's 1948 Report on the Merger Movement.

*mands a substantial share of a market, a finding of probability of reciprocal buying by the Commission, whose expertise the Congress trusts, should be honored, if there is substantial evidence to support it."* (Emphasis added.) Id., 85 S.Ct. at 1225.

■ The record in this case demonstrates how the merger of Ekco and McClintock probably could substantially lessen competition or tend to create a monopoly. We deal with probabilities in Section 7 cases, and not with either mere possibilities or absolute certainties. Id., 85 S.Ct. at 1214.

Chesley, in about 1954, and Blackman, in 1955, entered the commercial meat-handling equipment field in competition with McClintock. In 1957, Ekco tried unsuccessfully to purchase Chesley. In 1955, prior to Blackman's entry, Ekco had 93 percent of the total sales in this field. In 1958, after Blackman had been competing for three years, Ekco's share of sales dropped to 76.1 percent. Ekco acquired Blackman in 1958 and Ekco's share of total sales rose to 90.3 percent in 1960. See table, supra.

Ekco's acquisition of the assets of Blackman constituted a horizontal merger and appears to be clearly unlawful under Section 7.

As stated heretofore, McClintock had little cash and was subject to a highly restrictive loan agreement at the time Blackman was purchased. Thus, it appears unlikely that McClintock would have purchased Blackman but for Ekco's financial resources.

This shows to our satisfaction the reasonable probability that Ekco's purchase of McClintock may serve to entrench and preserve McClintock's monopoly. The Commission was justified in reaching this conclusion under the record before us.

In addition, the Commission found that Ekco was a "prime prospect to enter the commercial meat-handling equipment field on its own and offer McClintock effective competition." We conclude this determination has ample support in the record.

■ The Supreme Court has made it clear that the proscriptions of Section 7 apply to cases where the merging companies might become competitors. United ed States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Penn-Olin Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); United States v. El Paso Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). The policy underlying this rule "is that corporate growth by internal expansion is socially preferable to growth by acquisition." United States v. Philadelphia Nat. Bank, 374 U.S. 321, 370, 83 S.Ct. 1715, 1745 (1963).

The finding that there will probably be a substantial lessening of competition in violation of Section 7 due to the prospect that a corporation would have entered a line of commerce as a competitor if it had not acquired a corporation in that line of commerce, is a relatively new concept in the field of antitrust law. At this early stage of development, standards and tests to be applied in determining whether such mergers violate Section 7 have not crystallized. See Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1362–1386 (1965) for a discussion of this subject and the El Paso and Penn-Olin cases, supra.

It seems clear that "the fact that one of two parties to a merger is willing to engage in that transaction does not indicate that it is a potential competitor. True, the party to the merger desires to enter into the field of business in which the other party is engaged. That desire, however, sheds no light on the feasibility of the first party's entry apart from the merger. Any other rule would make every merger unlawful." Hale and Hale, Potential Competition Under Section 7: The Supreme Court's Crystal Ball, The Supreme Court Review, 171, 181 (1964).

■ It appears that the test is whether there is a "reasonable probability" that the acquiring corporation would

have entered the field by internal expansion but for the merger. United States v. Penn-Olin Co., 378 U.S. 158, 175, 84 S.Ct. 1710 (1964).

Ekco is the nation's largest producer of commercial baking pans which is a related product line to meat-handling equipment. In 1952, Ekco began manufacturing large aluminum meat boxes which were sold primarily to packers, provisioners, institutions and wholesale meat warehouses. These meat boxes were not used for the same purposes as the smaller utility lug which McClintock sold to retail butcher shops for the handling of, e. g., hamburger and meat scraps.

There was evidence that Ekco desired to market some of these related products through the channels used by McClintock in marketing its meat-handling equipment.

Commission Exhibit No. 1 is a report of the directors and statement of accounts for Ekco for the year ending December 31, 1954. In this report it is stated, "The McClintock Company broadens Ekco in manufacturing, merchandising and servicing in old and new fields. McClintock also brings Ekco new distribution opportunities and new channels of trade for our existing housewares and industrial lines."

Commission Exhibit No. 9–A is a bulletin from Ekco to its officers, supervisors and department heads entitled "Ekcogram" and dated June 30, 1954. In this bulletin it is stated, "They [McClintock] are a natural for our expansion of our regular lines in these channels of trade, which we have not adequately covered in the past. * * * For the first time it gives us the opportunity to service our existing commercial accounts by expanding the McClintock facilities."

Commission Exhibit No. 341, a news release, contains the following: "Ragir [Ekco's president] reported that his company plans additional expansion of the McClintock lines and an increase in its manufacturing facilities. He added that the acquisition leads Ekco into broader fields of manufacturing and merchandising and offers wider distribution opportunities for Ekco's existing housewares and commercial products."

We conclude, under the record before us, the Commission could find there was a reasonable probability that Ekco would have entered the commercial meat-handling industry by internal expansion, since Ekco was engaged in the manufacture of products in related lines and desired to expand the marketing of these products into supermarkets and retail grocery stores.

In sum, we hold that under the narrow factual situation in this case, viz., where Ekco, a large, growing and diversified manufacturing corporation, acquired McClintock, a small corporation with a virtual monopoly in a related product line; where Ekco aided McClintock in maintaining its monopoly by attempting to purchase one competitor and purchasing another; and where the record shows a reasonable probability that Ekco would have entered the commercial meat-handling equipment field by internal expansion, if it had not acquired McClintock, the Commission was warranted in reaching its ultimate conclusion that the acquisition of McClintock by Ekco violated Section 7 of the Clayton Act.

We do not hold that there may not be a lawful acquisition of a small concern by a large firm in a conglomerate merger situation. Because of the unique factual situation here and the lack of decisional guidelines, we limit this holding to the facts of this case.

Although the remedial features in the final order under review may appear rather harsh, we find no material controversy with respect to this aspect of the case. In any event, the order appears to fashion relief within the broad scope allowed the Commission in such cases.

For the foregoing reasons, the decision of the Commission under review is affirmed and its final order will be enforced.

Order affirmed and enforced.

754

## APPENDIX A

" * * *

### FINAL ORDER.

" * * *

"It Is Ordered that:

### I.

"Respondent, Ekco Products Company, a corporation, and its officers, directors, agents, representatives, employees, subsidiaries, affiliates, successors and assigns, within one (1) year from the date this order becomes final, shall divest, absolutely and in good faith, the following assets acquired by Ekco Products Company as a result of the acquisition by Ekco Products Company of the McClintock Manufacturing Company, together with all additions thereto and replacements thereof which have been made since the acquisition: (1) the McClintock trade name, and all patents, trademarks, trade secrets, lists of customers and accounts, inventories of goods furnished and in process, distribution agreements, supply and requirements contracts, tools, dies, punches and patterns, that are used in the manufacture or sale of commercial meat-handling equipment; (2) all other assets peculiar to the manufacture or sale of commercial meat-handling equipment, but not leaseholds, stamping machinery, industrial fork-lift trucks and other such assets not peculiar to the manufacture or sale of commercial meat-handling equipment; and (3) all other assets as may be necessary to reconstitute McClintock Manufacturing Company as a going concern and effective competitor in the manufacture and sale of commercial meat-handling equipment.

### II.

"By such divestiture, none of the assets described in paragraph I of this order shall be sold or transferred, directly or indirectly, to any person who at the time of the divestiture is an officer, director, employee, or agent of, or under the control or direction of, respondent or any of respondent's subsidiary or affiliated corporations, or owns or controls, directly or indirectly, more than one (1) percent of the outstanding shares of common stock of Ekco Products Company, or to any purchaser who is not approved in advance by the Federal Trade Commission.

### III.

"For a period of one (1) year following the divestiture required by paragraph I of this order, respondent shall, at its own expense, furnish such technical and marketing information within its possession or control as may be reasonably requested by the purchaser.

### IV.

"For a period of twenty (20) years following the date that this order becomes final, respondent shall not, without the prior approval of the Federal Trade Commission, acquire, directly or indirectly, through subsidiaries or otherwise, the whole or any party of the stock, share capital or assets of any corporation which is engaged in the manufacture or sale of commercial meat-handling equipment.

### V.

"Respondent shall periodically, within sixty (60) days from the date this order becomes final and every ninety (90) days thereafter until divestiture is fully effected, submit to the Commission a detailed written report of its actions, plans, and progress in complying with the provisions of this order and fulfilling its objectives.

"By the Commission, Commissioner Reilly not participating for the reason that he did not hear oral argument.

Joseph W. Shea,
Secretary.

Issued: June 30, 1964."