The **PROCTER & GAMBLE COMPANY**, Petitioner,

v.

**FEDERAL TRADE COMMISSION**, Respondent.

No. 15769.

United States Court of Appeals
Sixth Circuit.

March 18, 1966.

Frederick W. R. Pride, New York City, and Kenneth C. Royall, Washington, D. C. (Robert D. Larsen, New York City, on the brief; Richard W. Barrett, Dinsmore, Shohl, Barrett, Coates & Deupree, Cincinnati, Ohio, Royall, Koegel, Harris & Caskey, Washington, D. C., of counsel), for petitioner.

Gerald Harwood, Atty., F. T. C., Washington, D. C. (James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Frederick H. Mayer, Atty., F. T. C., Washington, D. C., on the brief), for respondent.

Before WEICK, Chief Judge, PHILLIPS, Circuit Judge, and GREEN,* District Judge.

WEICK, Chief Judge.

This is a proceeding to review an order of the Federal Trade Commission requiring The Procter & Gamble Company to divest assets of Clorox Chemical Company alleged to have been acquired by it in violation of Section 7 of the Clayton Act. 15 U.S.C. § 18.

The complaint filed by the Federal Trade Commission was served on October 7, 1957. It alleged that Procter is the leading producer in the United States of soap and detergent products, which it sells under brand names, and a major producer of other consumer products sold under brand names. The complaint further alleged that on August 1, 1957 Procter acquired Clorox Chemical Company, which was the nation's largest producer of household liquid bleach, and that Clorox sold its product nationally under the trade name of "Clorox". The complaint further alleged that Procter's acquisition of Clorox may substantially lessen competition or tend to create a monopoly in the sale of household liquid bleaches, in violation of Section 7 of the Clayton Act.

Procter filed an answer admitting its acquisition of the assets of Clorox, but denying the alleged probable anti-competitive effects of the acquisition and denying that it violated Section 7 of the Clayton Act.

Following hearings before a hearing examiner over a period of about fourteen months, the examiner issued his initial decision on June 17, 1960, finding that the acquisition violated Section 7 of the Clayton Act and ordered divestiture.

Appeals were taken to the Commission and on June 15, 1961, in a per curiam opinion, the Commission set aside the initial decision of the examiner because the record as presently constituted did not provide an adequate basis for determining the legality of the acquisition. It recognized that under such circumstance it might dismiss the complaint, but concluded that the public interest would be better served by remanding the case for the taking of additional evidence. It stated that the remand would afford a more complete post acquisition picture and allow "the Commission an informed hindsight upon which it can act rather than placing too strong a reliance upon treacherous conjecture."

The hearing examiner was directed to receive evidence relating to the competitive situation as it presently exists in the liquid bleach industry and was instructed that the evidence should relate to events occurring since November, 1958, and should include market share data in geographical regions, as well as information directed to more clearly delineating the production and merchan-

* Honorable Ben C. Green, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

dising facilities and teechniques utilized by Clorox under the control of Procter.

Prior to the hearing on the remand Procter filed a complaint in the United States District Court for the District of Columbia, to enjoin the Commission from proceeding with the remand. Its motion for a temporary restraining order was denied on the Commission's representation that the remand proceeding would take no more than two days. The action was later dismissed. The remand hearing was held and completed in two days. The hearing examiner rendered his second initial decision on February 28, 1962, which, like his first initial decision, found against Procter and ordered divestiture.

On the second appeal to the Commission, it ordered reargument on all contested issues of fact and law presented by the entire record and not merely by the record on the remand. The Commission in a 74 page opinion decided against Procter, adopting substantially the hearing examiner's findings and recommendations, except that it permitted Procter to divest the acquired assets by means of a spin-off.

Procter presents two questions here, namely, (1) whether the Commission's conduct of the proceeding and its reliance on matters dehors the record violated the Clayton and Administrative Procedure Acts and denied Procter due process of law; and (2) whether there was substantial evidence that the acquisition violated Section 7 of the Clayton Act. We will discuss these questions in the order presented.

### The Commission's Conduct of the Proceeding

As has been noted, the Commission rendered two decisions in this case. In the interim between the decisions the personnel of the Commission changed, so that only one Commissioner participated in both decisions.

Procter argues that since the Commission found in its first decision that the record did not form an adequate basis for determining the legality of the acquisition, it should have dismissed the complaint instead of remanding the case to the hearing examiner for further hearings.

■ Although it is true that the Commission could have dismissed the complaint, in our opinion it was not required to do so. It had the power, in its discretion, to order a remand and to permit the introduction of additional evidence. The Commission's first decision was not a final decision. The case was still pending before the Commission. At best, its first decision was interlocutory in nature and was subject to reconsideration and change. Kirk v. Olson, 245 U.S. 225, 38 S.Ct. 114, 62 L.Ed. 256 (1917); Cia Mexicana De Gas, S.A., v. F. P. C., 167 F.2d 804 (5th Cir., 1964); 2 Am.Jur.2d, Administrative Law, § 522.

Procter relies on Texaco, Inc. v. F. T. C., 118 U.S.App.D.C. 366, 336 F.2d 754 (1964), where the Commission was criticized on this and on another ground. The Supreme Court, however, vacated the order of the Court of Appeals directing that the complaint be dismissed and remanded the case for further proceedings. In any event, it does not appear to us that the Court of Appeals set aside the order because of the Commission's conduct alone. 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965). The Supreme Court's treatment of Texaco does not support Procter.

### The Commission's Alleged Reliance on Matters Dehors the Record

Procter asserts that the Commission's decision was based upon economic theories drawn from extra-record writings and was therefore violative of due process. It states that the decision was premised and critically based upon 85 citations of 43 extra-record writings which purport to deal with economic, political and social concepts.

■ These cited writings were general in nature. None of them dealt with the facts in the present case. At no place in its opinion did the Commission regard the citations as evidence. There was no citation of any economic writings by the hearing examiner in his second initial de-

cision, which adopted findings of fact and comprises about 88 pages of the record. The hearing examiner's first initial decision cites no such authority. The Commission apparently cited these writings to demonstrate that its decision comported with economic authority. The Supreme Court has cited and relied on economic writings in its consideration of Section 7 cases. F.T.C. v. Consolidated Foods, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); United States v. Penn-Olin Chem. Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). See also Ekco Products Co. v. F. T. C., 347 F.2d 745 (7th Cir., 1965); Crown Zellerbach Corp. v. F. T. C., 296 F.2d 800 (9th Cir., 1961).

We find no error in this respect.

*Was There Substantial Evidence That the Acquisition of Clorox by Procter Was Reasonably Likely to Result in A Substantial Lessening of Competition in Violation of Section 7 of the Clayton Act?*

It is difficult for us to harmonize the two decisions of the Commission in this case.

The decision of the first Commission set aside the first initial decision of the hearing examiner because the record as then constituted did not provide an adequate basis for determination of the legality of the acquisition. This is another way of saying that the evidence was insufficient to support a finding of illegality. The remand was for the sole purpose of taking post-acquisition evidence from which the Commission could rely on "informed hindsight" rather than "upon treacherous conjecture." The only evidence taken on the remand related to post-acquisition conditions.

The second Commission, contrary to the ruling of the first Commission, was of the view that the post-acquisition evidence was of little value and was admissible only in an unusual case (not the present case). It did discuss a portion of the post-acquisition evidence and stated that if it was considered it might furnish support for the findings which it made on the basis of other factors. It also mentioned that none of the phenomena (post-acquisition evidence) proved that the merger was unlawful. It stated that there had been no "dramatic" change in market structure or behavior in the years since the merger and that there was no basis for according the post-acquisition evidence particular weight since it "found its way, needlessly, into the record". The post-acquisition evidence will be discussed more in detail later.

The second Commission's decision was based entirely on the record submitted to the first Commission, which that body had ruled to be insufficient to support a finding of illegality.

We must determine whether the findings contained in the opinion of the second Commission which conflict with those of the first Commission, are supported by substantial evidence.

Procter is an Ohio corporation. At the time of the acquisition it was the nation's largest domestic manufacturer of soaps, detergents, and cleansers. It also manufactured and sold some food products, paper products, shampoos, dentrifrices, and home permanents. It had assets in excess of one-half billion dollars, and annual sales of $1.15 billion. It was an old, well managed and highly successful company, having some 56,000 shareholders.

Clorox Chemical Co. on the other hand was a relatively small company as compared with Procter. It was organized in 1928, and manufactured, distributed and sold a single product, "Clorox," a household liquid bleach which was used as a whitener as well as a disinfectant. Clorox was the largest producer of such bleach in the country.

During the period of five years prior to the merger, Clorox had a steady and continuous growth in sales, profits, and net worth. It had total assets (depreciated book value) of over $12,000,000, of which $4,000,000 was liquid, and had an

earned surplus of over $7,000,000. It had annual sales of slightly less than $40,000,000, which constituted 48.8% of the national sales of liquid household bleach. It had thirteen plants located throughout the country, and was the only producer of bleach that distributed on a national scale. It employed no salesmen but marketed its product solely through brokers or distributors.

The merger negotiations were initiated by shareholders of Clorox, and after study for almost two years by Procter, they ripened into a merger, whereby Procter exchanged 639,578 shares of its common stock, worth about $30.3 million, for the assets of Clorox, which were transferred to a Procter subsidiary.

Household liquid bleach is manufactured by a relatively simple process. Chlorine is introduced into a caustic soda solution, the resulting chemical reaction being one which forms sodium hypochlorite. The bleach consists of 5¼% hypochlorite and 94¾% water. The bleach retails for about fifteen to nineteen cents per quart. It is a low priced, high turnover item, sold mainly to housewives, in grocery stores and supermarkets. Because of the weight of both the product and its container, as reflected in the high cost of shipping, it has been found feasible to market the bleach mostly in areas not more than three hundred miles from the location of its manufacture.

Procter had never engaged in the manufacture or distribution of household liquid bleach prior to the merger and there is no evidence that it ever planned to do so on its own. It was not a competitor, supplier or customer of Clorox.

There was no dispute between the parties over the line of commerce or the section of the country. The line of commerce was household liquid bleach and the section of the country was the nation and a series of regional markets.

The following table shows the market shares prior to the merger of the six leading producers of household liquid bleach, and about two hundred small producers appearing under the title of "All Other Brands." The "All Other Brands" also include chain stores and supermarkets who sell their own private brands, and account for about 20% of the market.

"Market Shares of Household Liquid Bleach Manufacturers
(Consumer Dollar Basis)

| Brand | Percentage of Total U. S. Sales |
|---|---|
| Clorox ..................... | 48.8 |
| Purex ..................... | 15.7 |
| Roman Cleanser ............ | 5.9 |
| Fleecy White ............... | 4.0 |
| Hilex ..................... | 3.3 |
| Linco ..................... | 2.1 |
| Total ..................... | 79.8 |
| All Other Brands ............ | 20.2" |

The two hundred producers were mostly small concerns or individuals, some of whom were characterized as small "garage" or "down cellar" bleach producers. Only eight of such producers had assets in excess of $1,000,000, and very few had assets of more than $75,000.

The market shares of the six leading producers on a consumer dollar basis for the nine principal territories are shown on the table appearing at the end of this opinion as Appendix "A".

Although there was evidence that all producers use the same formula in the manufacture of liquid household bleach, Clorox attributed its success to its maintaining a high degree of quality control in its production process. The fact that prior to the merger its sales accounted for nearly fifty per cent of the market, would seem to indicate its product's wide acceptance and preference by housewives. The Commission, on the other hand, attributed the success of Clorox to extensive advertising. Clorox did spend about ten per cent of its sales in advertising. But even though the advertising was extensive, the product had to be good in order for it to obtain repeat-purchases by the housewife. This is demonstrated by the fact that large chains like A&P and Safeway Stores carry Clorox on their

shelves even though they market their own private brands of bleach.

The Commission was of the opinion that the household liquid bleach market was highly concentrated, with barriers making it virtually impossible to be penetrated nationally. It probably would be difficult to penetrate this market on a national scale without the expenditure of a large sum of money. There is no evidence that anyone has ever tried it. Clorox was the only producer in that field. The fact that the bleach is a low cost, high turnover item, with accompanying small profits, requiring many factories in strategic locations, would probably act as a deterrent. We would doubt that a small company like Clorox, with assets of only $12,000,000, would deter large companies like Lever Brothers and Colgate-Palmolive Peet Co., (Procter's large competitors) from entering the field on a national basis if they concluded that the profits were sufficiently attractive to justify the expenditure required. We would think that any concern desiring to enter the household liquid bleach market would probably try it on a regional basis.

The fact that in addition to the six named producers sharing eighty per cent of the market, there were two hundred smaller producers, both prior and subsequent to the merger, would not seem to indicate anything unhealthy about the market conditions. And the post-merger evidence was to the effect that the other producers subsequent to the merger were selling more bleach for more money than ever before.

It was the position of Procter that it merely supplanted Clorox in the market and that the merger did not increase the market share of Clorox because Procter was not in that market.

The Commission points out that with Procter's huge finances, its know-how in the manufacturing and marketing of its own products, its eighteen hundred salesmen, and its ability to obtain discounts in advertising, it is in a much better position than Clorox to compete with all the bleach competitors, and that Procter could sell for lower prices (even below cost) and this would probably lessen competition.

But Clorox, and not Procter, had the know-how in the household liquid bleach business as evidenced by its success in starting from scratch and building a $12,000,000 corporation with sales of nearly $40,000,000 annually and obtaining over forty-eight per cent of the market. The finances of Clorox, although not comparable with Procter's were entirely adequate for its purpose and enabled it to continue its growth and to maintain and increase its share in the market. There has been no significant change in Clorox's market share in the four years subsequent to the merger.

Procter has eighteen hundred salesmen. Since the merger Procter has continued with Clorox distributors and has not used its own salesmen. Assuming that it may desire at some time to change over to salesmen, it is not probable that it could do so without substantially increasing the size of its sales force, which would involve additional expense. It is of course possible that some economies could be effected if a changeover is made, but that is no reason to condemn a merger otherwise lawful.

Clorox spent about ten per cent of its sales in advertising. Procter, in its soap and cleansing products business, is one of the nation's largest advertisers, spending about $70,000,000 in the year of the merger, and an additional $47,000,000 for promotion. The Commission points out that Procter could obtain larger discounts than Clorox in television network, newspaper and magazine advertising, and could adapt the advertising on a national or local basis as the need arises. Clorox used principally spot announcements rather than network advertising, which were effective and very adequate for its own purpose. The cost of network advertising would seem to depend on the type of talent utilized on the program. TV stations, magazines and newspapers are not required to give discounts for quantity advertising and presumably could discountinue them at any time.

Doubtless Procter could advertise more extensively than Clorox, but there is such a thing as saturating the market. We find it difficult to base a finding of illegality on discounts in advertising. Here again, in our judgment the fact that a merger may result in some economies is no reason to condemn it.[1]

The Commission urges that Procter, with its complete line of household products, is in a much better position than Clorox to obtain desirable shelf space in grocery stores, for the display of all of its products, including bleach. The evidence is clear that Clorox, prior to the merger, with distributors and not a sales force of its own, obtained very adequate shelf space, even in chain stores and supermarkets which displayed their own private brands. Where a product like Clorox has great consumer demand, a grocer is very likely to display it in order to satisfy his customers. We find no merit in this claim.

The Commission directed attention to Procter's success in marketing new products. In 1957 Procter introduced a new abrasive cleanser called "Comet". At the time Procter entered the field, "Ajax", manufactured by Colgate-Palmolive, sold about fifty-six per cent of the total national sales of abrasive cleansers. Other leading brands were "Bab-O", which had twenty-four per cent of the total national sales, and "Blue Dutch", which had ten per cent. Over a period of twenty-two months Procter spent $7.2 million in advertising and attained 36.5% of the national market; Ajax dropped to 36.9% and all other brands, including Bab-O and Blue Dutch, fell from 44% to 26.6%.

If anything, this tends to show that Procter could have entered the liquid household bleach market on its own if it had desired to do so, and without having to defend the action of the Federal Trade Commission which followed its merger with Clorox. There is no evidence that it had any such intention. The share

of the market it could have captured, whether it could have permanently retained it, and the cost, are matters of conjecture.

The Commission further points to an Erie County, Pennsylvania incident which took place after the merger, as evidence of the effectiveness of Procter's intensive advertising and promotion practices. Prior to the Erie incident, Clorox had about 52% of the market in that area, with "101", a brand sold by Gardner Mfg. Co., about 29% of that market. Purex, a competitor of Clorox, was not in that market. Purex decided to enter the Erie market. It introduced a new bottle and an alleged improvement in its bleach. It engaged in an intensive advertising and promotional campaign, offering reductions of ten and fifteen cents on any size bottle and offering twenty and twenty-five cents reductions on half-gallon and gallon purchases. In about two months Purex captured 33% of the Erie market. Clorox dropped from 52% to 35%, and "101" brand dropped to 17%. Procter retaliated by offering its bleach at three cents off per quart, five cents off per half-gallon, and seven cents off one-gallon sizes. Subsequently it offered a one dollar value ironing board cover for fifty cents with each purchase of Clorox. Procter supplemented the regular newspaper advertising of Clorox with extensive TV spots. The market for Clorox was not only regained but its sales increased by 1% and Purex's share fell to 7%.

It was undisputed that Purex started this "price war". We think Procter was justified in retaliating to defend itself, to meet competition, and to prevent its business from being taken away. The incident revealed the power of Purex, which retreated after Procter adopted protective measures. It should be noted, however, that without the merger Clorox could, and in all probability would have resorted to the same measures and in all

---

1. We cannot assume that Procter would divert the large sums which it found necessary to expend for advertising and promotion to maintain its competitive position in

the soap and cleanser field to wipe out its competitors in the household bleach market.

likelihood it would have obtained the same results. It had the know-how and the necessary finances to do so.

There was no evidence that Procter at any time in the past engaged in predatory practices, or that it intended to do so in the future. Ample authority exists for the Commission to deal with any such practices when the occasion arises. 15 U.S.C. § 13, Discrimination in prices— Underselling in particular localities; 15 U.S.C. § 14, Tying Agreements; 15 U.S.C. § 45, Unfair methods of competition.

The Commission urges that the merger eliminated a potential competitor, namely Procter. This issue was never raised until after all the evidence was in and the appeal was taken to the second Commission. There was no evidence tending to prove that Procter ever intended to enter this field on its own. Its promotion department, in considering whether to enter into the proposed merger with Clorox recommended against Procter going into the bleach business on its own. The Commission's finding, therefore, is based on mere possibility and conjecture.

■ The merger in the present case was neither vertical nor horizontal, but conglomerate. The second Commission has characterized it as product extension. Since the 1950 amendments to Section 7, conglomerate as well as vertical and horizontal mergers come within the proscription of the Act. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

■ In a Section 7 case it is necessary to determine whether there is a reasonable probability that the merger may result in a substantial lessening of competition.

■ Amended Section 7 was intended to arrest anticompetitive tendencies in their incipiency. United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Philadelphia Nat'l Bank, supra; Brown Shoe Co. v. United States, supra.

A mere possibility is not enough, United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); nor is certainty required, United States v. Penn-Olin Chem. Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964).

Prior to the merger Clorox was a well managed, adequately financed company, steadily increasing its business and having nearly fifty per cent of the market. It had no competition on the national scale. Competition existed only in regional areas. Procter merely stepped into the shoes of Clorox. Whether or not it can do better than Clorox in the liquid household bleach field, remains to be seen.

The Nielsen tables showing market share and point change on a unit and dollar basis, for a period of five years prior to the merger and four years after, do not reveal any significant change in the rate of growth of Clorox. Appendix "B".

Both tables showed a decline for Clorox in the year 1961. On the other hand, the total sales of liquid household bleach, other than Clorox, substantially increased both before and after the merger. Appendix "C".

It is obvious therefore that subsequent to the merger, competitors of Clorox sold substantially more bleach for more money than prior thereto. This evidence certainly does not prove anti-competitive effects of the merger. The Commission gave it no consideration.

■ We think the Commission was in error in ruling that post-merger evidence was admissible only in unusual cases and that it crept into the record needlessly in the present case, and in giving it no weight. This evidence was in the record, not needlessly, but because of the order of the first Commission.

The Commission relied on F. T. C. v. Consolidated Foods, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965). The Supreme Court in that case did not hold that post-acquisition evidence was irrelevant and inadmissible. On the contrary it

cited United States v. E. I. Du Pont De Nemours & Co., supra, as authority for considering such evidence. See also Ekco Products Co. v. F. T. C., 347 F.2d 745 (7th Cir. 1965); Reynolds Metals Co. v. F. T. C., 114 U.S.App.D.C. 2, 309 F.2d 223, 230 (1962)[2]. The Supreme Court said that the post-acquisition evidence should not be given conclusive weight or allowed to override all probabilities. It held that the Court of Appeals in that case attached too much weight to it.

■ Any relevant evidence must be considered in a Section 7 case involving as it does the drastic remedy of divestiture. The extent to which inquiry may be made into post-merger conditions may well depend on the facts of the case, and where the evidence is obtained it should not be ignored. The weight to be attached to it depends upon all the facts and circumstances of the case.

It is contended that Procter's behavior subsequent to the merger may have been influenced by the pendency of the present proceeding. This is pure conjecture. As before pointed out, Procter was not in the habit of indulging in predatory practices, and if it engages in such practice in the future the Commission has ample power to deal with it.

The Commission and Procter rely on Ekco Products Co. v. F. T. C., supra, which cited the Commission's decision in the present case. *Ekco* involved two acquisitions, one of which was horizontal, and the other conglomerate. The facts were different in *Ekco* and the Court very carefully limited the decision to the facts of that case.

■ In considering the question of the substantiality of the evidence, we cannot ignore the two conflicting opinions of the Commission based upon the same evidence. Where an agency overturns findings of fact of a hearing examiner, this fact is considered by a reviewing court. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 496, 497, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Ohio Calcium Co., 133 F.2d 721 (6th Cir. 1943). Here the second Commission rejected the findings of the previous Commission. In our opinion, the same rule applicable to hearing examiners ought to be applied here.

■ As pointed out by the first Commission, the findings of illegality may not be based upon "treacherous conjecture", possibility, or suspicion. And yet this is exactly what the second Commission indulged in by basing many of its findings and conclusions upon hypotheses which the record shows have never taken place. An illustration of this is the finding that Procter was on the "brink" of entering the market on its own. Household liquid bleach is an old product; Procter is an old company. If Procter were on the brink it is surprising that it never lost its balance and fell in during the many years in which such bleach was on the market. It had never threatened to enter the market. Cf. United States v. Penn-Olin Chem. Co., supra, 378 U.S. at 173, 84 S.Ct. 1710.

Other large corporations which were competitors of Procter, such as Lever Bros. and Colgate-Palmolive, had capabilities of entering the field. Monsanto Chemical and Diamond Alkali Co. had engaged in negotiations with Clorox. There are many other large companies in the country which had similar capabilities of entering into a conglomerate merger. There was no reasonable probability that Procter would have entered the household liquid bleach market but for the merger. United States v. Penn-Olin Chem. Co., supra.

Clorox desired to sell its assets. Its owners were reaching the age of retirement and wanted to transform their stock into a marketable security of a successful company. A small company could not

**2.** Reynolds involved a vertical merger where post-merger evidence offered by the Commission showed that five of Arrow's seven competitors had by 1957 dropped from 14% to 47% below 1955 sales. If post-acquisition evidence is admissible to prove anticompetitive effects, it should also be admissible to establish that the merger resulted in no lessening of competition.

84

qualify. Clorox either had to sell to a larger company or not sell at all.

The Commission recognized that complete guidelines for this type of merger have not yet been developed and that the case presented a challenge to it and to the courts "to devise tests more precisely adjusted to the special dangers to a competitive economy posed by the conglomerate merger." We do not believe these tests should involve application of a per se rule.

The Supreme Court has not ruled that bigness is unlawful, or that a large company may not merge with a smaller one in a different market field. Yet the size of Procter and its legitimate, successful operations in related fields pervades the entire opinion of the Commission, and seems to be the motivating factor which influenced the Commission to rule that the acquisition was illegal.

Here Procter was merely adding another product to its line, which was somewhat akin to the products which it was already handling. They were all household items sold in grocery stores. It could have entered the market on its own, but decided not to do so.

■ Considering the record as a whole, we are of the opinion that the decision of the second Commission is not supported by substantial evidence. Universal Camera Corp. v. N. L. R. B., supra.

We see no point in remanding this case to the Commission. This protracted litigation, which is going on to its ninth year, should come to a close.

The order of the Commission is set aside and the cause is remanded with instructions to dismiss the complaint.

## APPENDIX A

### MARKET SHARES OF LIQUID BLEACH BRANDS AS SHOWN BY THE NIELSEN FOOD INDEX FOR NINE TERRITORIES

| Section of The Country | Clorox | Purex | Fleecy White | Hilex | Linco | Roman Cleanser | All Others |
|---|---|---|---|---|---|---|---|
| New England | 56.0 [9] | —[10] | — | — | — | — | 44.0 |
| Metropolitan New York | 64.3 | — | — | — | — | — | 35.7 |
| Middle Atlantic | 71.6 | — | — | — | — | — | 28.4 |
| East Central | 42.4 | 5.0 | 5.2 | 0.9 | 0.7 | 27.2 | 18.6 |
| Metropolitan Chicago | 28.6 | 0.1 | 18.9 | 0.1 | 50.3 | — | 2.0 |
| West Central | 34.5 | 20.6 | 9.0 | 25.8 | 2.1 | — | 8.0 |
| Southeast | 52.6 | 16.0 | 5.7 | — | — | 5.3 | 20.4 |
| Southwest | 48.4 | 39.6 | 3.9 | — | — | — | 8.1 |
| Pacific | 39.2 | 42.4 | — | — | — | — | 18.4 |

Source: 154X. The section of the country included in each of the Nielsen territories is shown on page 70 of CX 325 (certified to the Court, but not printed). The accuracy of the Nielsen data was stipulated (820a–21a).

9. Percent of total sales of liquid bleach on a consumer dollar basis.

10. No figure given if the brand listed is not sold in the area.

## APPENDIX B

### TOTAL UNITED STATES

Nielsen — Liquid Household Bleaches
Summary of Clorox Share Changes

32 oz. Equivalent Unit Basis:

| Year Ended | Share | Point Change |
|---|---|---|
| August 1, 1953 | 41.4 | — |
| August 1, 1954 | 43.0 | +1.6 |
| August 1, 1955 | 44.0 | +1.0 |
| August 1, 1956 | 44.8 | +0.8 |
| August 1, 1957 | 45.3 | +0.5 |
| Total Change | | +3.9 |
| Average Annual Change | | +0.975 |
| August 1, 1958 | 45.8 | +0.5 |
| August 1, 1959 | 46.8 | +1.0 |
| August 1, 1960 | 48.8 | +2.0 |
| August 1, 1961 | 48.6 | —0.2 |
| Total Change | | +3.3 |
| Average Annual Change | | +0.825 |

Dollar Basis at Cost Price to Consumer:

| Year Ended | Share | Point Change |
|---|---|---|
| August 1, 1953 | 45.3 | — |
| August 1, 1954 | 46.4 | +1.1 |
| August 1, 1955 | 47.1 | +0.7 |
| August 1, 1956 | 47.8 | +0.7 |
| August 1, 1957 | 48.4 | +0.6 |
| Total Change | | +3.1 |
| Average Annual Change | | +0.775 |
| August 1, 1958 | 48.7 | +0.3 |
| August 1, 1959 | 50.1 | +1.4 |
| August 1, 1960 | 51.8 | +1.7 |
| August 1, 1961 | 51.9 | +0.1 |
| Total Change | | +3.5 |
| Average Annual Change | | +0.875 |

## APPENDIX C

## TOTAL UNITED STATES

Nielsen — Liquid Household Bleaches

### SALES OF ALL LIQUID HOUSEHOLD BLEACHES — OTHER THAN CLOROX

Prior to Acquisition

| Year Ended | 32 ounce Equivalent Units | Consumer Dollars |
|---|---|---|
| August 1, 1953 | 270,011,000 | $39,178,000 |
| August 1, 1954 | 273,046,000 | 40,230,000 |
| August 1, 1955 | 290,092,000 | 43,443,000 |
| August 1, 1956 | 308,797,000 | 46,638,000 |
| August 1, 1957 | 319,734,000 | 49,478,000 |

Subsequent to Acquisition

| Year Ended | | |
|---|---|---|
| August 1, 1958 | 329,656,000 | $53,910,000 |
| August 1, 1959 | 345,726,000 | 56,287,000 |
| August 1, 1960 | 346,038,000 | 56,197,000 |
| August 1, 1961 | 365,354,000 | 59,254,000 |